UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:20-CR-746 SEP |
| | ) | |
| JARVIS L. FIELDS, | ) | |
| | ) | |
| Defendant. | ) | |

## GUILTY-PLEA AGREEMENT

COME NOW the parties and hereby agree as follows:

## 1.    PARTIES

The parties are Defendant Jarvis L. Fields, represented by defense counsel Nick A. Zotos, and the United States of America ("the Government"), represented by the Office of the United States Attorney for the Eastern District of Missouri. This agreement does not, and is not intended to, bind any governmental office or agency other than the United States Attorney for the Eastern District of Missouri. The Court is neither a party to nor bound by this agreement.

## 2.    GUILTY PLEA

**A.    The Plea:**    Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(A), in exchange for Defendant's voluntary plea of guilty to Count One of the Indictment, the Government agrees to move for the dismissal as to Defendant of Count Two at the time of sentencing. Moreover, the Government agrees that no further federal prosecution will be brought in this District relative to Defendant's violations of federal law, known to the Government at this time, arising out of the events set forth in the Indictment.

**B.    The Sentence:**    The parties agree that the recommendations contained herein fairly and accurately set forth some guidelines that may be applicable to this case. The parties further agree that either party may request a sentence between 46 and 57 months' imprisonment, which may be above or below the U.S. Sentencing Guidelines range (combination of Total Offense Level and Criminal History Category) ultimately determined by the Court, pursuant to any chapter of the Guidelines, 18 U.S.C. § 3553, or any other provision or rule of law not addressed herein. The parties understand that the Court is neither a party to, nor bound by, the Guidelines recommendations agreed to in this document.

**3.    ELEMENTS**

As to Count One, Defendant admits to knowingly violating 21 U.S.C. § 841(a)(1), admits there is a factual basis for the plea, and fully understands that the elements of the crime are as follows:

**(i)**    Defendant was in possession of fentanyl, a Schedule II controlled substance;

**(ii)**    Defendant knew that he was in possession of fentanyl; and

**(iii)**    Defendant intended to distribute some or all of the fentanyl to another person.

**4.    FACTS**

The parties agree that the facts in this case are as follows and that the Government would prove these facts beyond a reasonable doubt if the case were to go to trial. These facts may be considered as relevant conduct pursuant to U.S.S.G. § 1B1.3.

**A.    Underlying Arrest**

On April 10, 2020, the St. Louis County Police Department received a report of shots fired at the 2400 block of Princess Drive in North St. Louis County. When officers arrived on scene, they noticed a blue Ford Fusion idling with its brake lights illuminated. The officers decided to investigate due to the suspicious nature of the vehicle and its proximity to where the shots had

been fired. At that point, Co-Defendant Damion Carter exited the driver's seat of the Fusion and approached officers. He was directed to return to the vehicle, which he did after several commands. Back in the driver seat, Carter told officers that he and his passenger, Fields, were parked in the middle of the street "chilling" when a group of masked individuals drove past and shot at some guys on the corner. The officers asked if there were any firearms in the vehicle. Both Carter and Fields said no, but Carter admitted he had some marijuana in the car.

Meanwhile, dispatch advised the officers that the license plate number from the Fusion had been reported stolen. At first, Carter claimed the Fusion was his girlfriend's, but he eventually explained that the car actually belonged to his girlfriend's other boyfriend. He also spontaneously admitted that he did, in fact, have a gun under the driver's seat. Officers handcuffed Carter so they could continue conducting their investigation safely.

Officers next asked Fields if he had anything they needed to know about. He hesitated and still did not answer when asked a second time. Fields then got out of the car. Officers repeatedly instructed him to put his hands on the vehicle, which he failed to do. As officers attempted to restrain him, Fields advised he had a gun in his satchel, which was strapped across his shoulder. He asked if he could get the gun out and put the money he was holding (more than $1,000 in small-denomination bills) into his pocket. When officers said no, Fields turned away and physically resisted their efforts to secure the bag. He then pushed one officer in the chest, knocking him back. After a struggle, officers brought Fields to the ground. They were able to secure him only after cutting a strap on the bag and forcibly removing it. One of the officers cut his hand in the process. When Fields was eventually handcuffed, he stated, "I ain't gonna lie, there are drugs in the bag."

Officers immediately found a stolen Glock 23 GEN4 inside the satchel. They later discovered approximately 430 clear capsules containing fentanyl, two bags of white powder

containing fentanyl, a bag with 12 other pills, and an EBT receipt that belonged to Fields's then-girlfriend. Officers also recovered a black, .40-caliber Taurus PT 140 from underneath the driver's seat, where Carter said it would be located. Lastly, in the backseat, they found a red Nike duffle bag containing a grinder, two scales, pill trays, and a toothbrush—all with a white-powder residue consistent with the fentanyl in Fields's satchel. The duffle bag also contained the key to a stolen Mustang, which was later traced to a vehicle Fields was driving during a separate arrest in May 2020. The below photo depicts the contraband seized from the Fusion:



**B.     Recorded Jail Calls**

After their arrest on April 10, 2020, both Carter and Fields were transported to the St. Louis County Justice Center, where they were booked on multiple charges. In a recorded jail call, Carter admitted that he and Fields had "joints" (firearms), "weed" (marijuana), and "finn" (fentanyl) in the car. Fields likewise admitted in a separate call that he had a "fat ass bag of fries" (fentanyl capsules) on him. In a prohibited three-way call, Fields told Carter he should have "pulled off." During other calls, Fields complained that he told Carter to flee but that Carter said he was too high and was afraid he would crash. After his release from custody, Carter called Fields several times and the two discussed falsely telling police either that they found the satchel in the car or that Fields used "the stuff" himself and was merely a user. In other words, the two conspired to make material false statements to law enforcement related to the investigation of the instant offense. As part of this conspiracy, Fields went on to make material false statements regarding the satchel and duffle bag during an post-*Miranda* interview. Fields also called an unidentified female and convinced her to falsely report to police that his Mustang keys and cash were hers so he could get them back.

**C.     Carter's Federal Arrest and Interview**

On February 3, 2021, the United States Marshals Service executed Carter's federal arrest warrant and took him into custody. Detectives with the St. Louis County Police Department were alerted of the arrest and responded to the Jennings Jail. During a post-*Miranda* interview, Carter made multiple voluntary admissions related to his participation in Fields's drug-trafficking activities.

Specifically, Carter admitted to aiding and abetting Fields in distributing fentanyl many times. Carter explained that he had known Fields for at least ten years and that he considered Fields to be his "street brother." Carter had witnessed Fields distribute fentanyl on multiple occasions, during which both he and Fields "most definitely" carried guns. Cater further indicated that if

someone had attempted to rob or harm Fields, he would have been willing to shoot them to defend Field's narcotics sales. These admissions were consistent with information provided by a confidential informant (CI), who indicated that Fields and Carter were known to ride in a vehicle armed, selling fentanyl. The CI also indicated that Fields would talk about guns, stolen vehicles, and "whipping" up fentanyl.

As to the night of his underlying arrest, Carter explained that he and Fields were "chillin" and getting high. They took at least Percocet and Xanax, and Carter also indicated they both tested positive for fentanyl at the St. Louis County Justice Center. He also admitted he possessed a firearm that night and that, if he had been aware that the car was reported stolen, he would have fled from the police and was willing to die to get away from them.

**D.     Fields's Arrest**

On May 20, 2021, officers with the St. Louis County Police Department were conducting surveillance on a known drug house when Fields arrived in a red Dodge Avenger. Fields conducted two hand-to-hand transactions with separate individuals before leaving. Officers followed Fields until he arrived at a residence on Norwich Drive, where they conducted an investigative stop. Fields admitted to having a gun in his blue bag, where officers found a black Springfield XD 9mm pistol with a large-capacity magazine. Fields also had an orange pill bottle containing multiple white pills and a plastic bag containing multiple green and orange pills in his pants pockets. He was taken into custody and his federal arrest warranted was executed.

**E.     Other Relevant Facts**

The suspected controlled substances from both incidents were later submitted to and analyzed by an expert criminalist with the St. Louis County Police Department Crime Laboratory. From the Fields's initial arrest, the lab confirmed that: (a) the 430 clear capsules contained approximately 16.77g of a mixture containing fentanyl; (b) the two clear plastic bags of white

powder were confirmed to have approximately 4.456g of a mixture containing fentanyl; and (c) the other 12 pills were determined to be Oxycodone (.0825g), Clonazolam (.52g), and Alprazolam (.002g).[1] From Fields's second arrest, the lab determined that the pills were methamphetamine (1.192g), Alprazolam (.015g), and Hydrocodone (.04g). Fields specifically acknowledges that he knew all of these drugs were controlled substances and that the grinder, two scales, pill trays, and toothbrush were used for drug packaging. Fields further admits to knowingly possessing these controlled substances with the intent to distribute some or all of them to another individual. For example, the fentanyl alone had an estimated street value of more than $2,000.

An expert firearms examiner also examined the Glock 23 GEN4 recovered from Fields's satchel during the first incident and the Springfield XD 9mm pistol recovered from the blue bag during the second incident. Both guns were manufactured outside the State of Missouri and are capable of expelling a projectile by the action of an explosive—thus qualifying as a "firearm" under federal law. Fields admits to knowingly possessing the firearm. He also acknowledges the Glock 23 was reported stolen and the Springfield pistol was loaded with a large-capacity magazine

## 5.   STATUTORY PENALTIES

Defendant fully understands that the maximum possible penalty provided by law for the crime to which Defendant is pleading guilty is imprisonment of not more than 20 years, a fine of not more than $1,000,000, or both such imprisonment and fine. The Court shall impose a period of supervised release of at least 3 years.

## 6.   U.S. SENTENCING GUIDELINES (2021 MANUAL)

Defendant understands that this offense is affected by the U.S. Sentencing Guidelines and the actual sentencing range is determined by both the Total Offense Level and the Criminal History

---

[1] Additionally, Carter's personal-use marijuana weighed approximately .88g.

Category. The parties agree that the following are the U.S. Sentencing Guidelines Total Offense Level provisions that apply.

### A.     **Chapter 2 Offense Conduct**

**i.     Base Offense Level:** The parties agree that Defendant is accountable for possessing with intent to distribute approximately 21.226g of fentanyl, 1.192g of methamphetamine, .0825g of Oxycodone, .52g of Clonazolam, .017g of Alprazolam, .04g of hydrocodone. The parties further agree that the total amount of controlled substances for which Defendant is accountable is, in the aggregate, approximately 56.269kg of converted drug weight, resulting in a Base Offense Level of 18, as found in U.S.S.G. § 2D1.1(c)(11).

**ii.     Specific Offense Characteristics:** The parties agree that the following Specific Offense Characteristics apply:

- Two-level increase pursuant to U.S.S.G. § 2D1.1(b)(1) because Defendant possessed a dangerous weapon.

### B.     **Chapter 3 Adjustments**

**i.     Victim-Related Adjustments:** The parties agree that six levels should be added because Defendant, knowing that a person was a law enforcement officer, assaulted such officer in resisting arrest in a manner creating a substantial risk of serious bodily injury (and that did, in fact, injure the officer), pursuant to U.S.S.G. § 3A1.2(c)(1).

**ii.     Role-Related Adjustments:** The parties agree that two levels should be added because Defendant was an organizer, leader, manager, or supervisor of Co-Defendant Damion Carter, who aided and abetted Defendant in possession with intent to distribute fentanyl both during the charged conduct and previously.

     **iii.**  **Acceptance of Responsibility:** The parties recommend that two levels should be deducted pursuant to U.S.S.G. § 3E1.1(a) because Defendant has clearly demonstrated acceptance of responsibility. If this deduction is applied, and if Defendant is otherwise eligible, then the Government moves to deduct one additional level pursuant to U.S.S.G. § 3E1.1(b)(2), because Defendant timely notified authorities of the intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

    The parties agree that if Defendant does not abide by all of the agreements made within this document, Defendant's failure to comply is grounds for the loss of acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. The parties further agree that Defendant's eligibility for this reduction is based upon the information known at the present time and that any actions of Defendant which occur or which become known to the Government subsequent to this agreement and are inconsistent with Defendant's acceptance of responsibility, including criminal conduct, are grounds for the loss of acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. In any event, the parties agree that all of the remaining provisions of this agreement remain valid and in full force and effect.

    **C.**  **Estimated Total Offense Level:** The parties agree that the Total Offense Level for Count One is 25, unless defendant is a Career Offender. Depending on the underlying offense and defendant's criminal history, defendant could be a Career Offender pursuant to U.S.S.G. § 4B1.1. If the Court finds defendant is a Career Offender, the Total Offense Level may be higher and the Criminal History Category may be as high as Category VI. Defendant has discussed these possibilities with defense counsel. Both parties reserve the right to argue that Defendant is or is not a Career Offender.

**D.** **Criminal History:** The determination of Defendant's Criminal History Category shall be left to the Court. Either party may challenge, before and at sentencing, the finding of the Presentence Report as to Defendant's criminal history and the applicable category. Defendant's criminal history is known to Defendant and is substantially available in the Pretrial Services Report.

**E.** **Effect of Parties' U.S. Sentencing Guidelines Analysis:** The parties agree that the Court is not bound by the Guidelines analysis agreed to herein. The parties may not have foreseen all applicable Guidelines. The Court may, in its discretion, apply or not apply any Guideline despite the agreement herein and the parties shall not be permitted to withdraw from the plea agreement. The Government recognizes it is bound by the specific agreements made herein but reserves the right to answer any questions the U.S. Probation Office or the Court might have related to sentencing or present evidence at the Court's request.

**7.** **WAIVER OF APPEAL AND POST-CONVICTION RIGHTS**

**A.** **Appeal:** Defendant has been fully apprised by defense counsel of Defendant's rights concerning appeal and fully understands the right to appeal the sentence under 18 U.S.C. § 3742.

**i.** **Non-Sentencing Issues:** The parties waive all rights to appeal all non-jurisdictional, non-sentencing issues, including, but not limited to, any issues relating to pretrial motions, discovery and the guilty plea.

**ii.** **Sentencing Issues:** In the event the Court accepts the plea and sentences Defendant to no more than the greater of the parties' jointly recommended sentence of 46 to 57 months or the Sentencing Guidelines range, Defendant hereby waives all rights to appeal all sentencing issues other than Criminal History. Similarly, the Government hereby waives all rights to appeal all sentencing issues other than Criminal History, provided the Court accepts the plea

and sentences Defendant to no less than the lower of the parties' jointly recommended sentence of 46 to 57 months or the Sentencing Guidelines range.

**B.**      **Habeas Corpus:**      Defendant agrees to waive all rights to contest the conviction or sentence in any post-conviction proceeding, including one pursuant to 28 U.S.C. § 2255, except for claims of prosecutorial misconduct or ineffective assistance of counsel.

**C.**      **Right to Records:**      Defendant waives all rights, whether asserted directly or by a representative, to request from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including any records that may be sought under the Freedom of Information Act, *see* 5 U.S.C. § 522, or the Privacy Act, *see* 5 U.S.C. § 552(a).

**8.      OTHER**

**A.**      **Disclosures Required by the United States Probation Office:**      Defendant agrees to truthfully complete and sign forms as required by the United States Probation Office prior to sentencing and consents to the release of these forms and any supporting documentation by the United States Probation Office to the United States.

**B.**      **Civil or Administrative Actions not Barred; Effect on Other Governmental Agencies:** Nothing contained herein limits the rights and authority of the United States to take any civil, tax, immigration/deportation or administrative action against Defendant.

**C.**      **Supervised Release:**      Pursuant to any supervised release term, the Court will impose standard conditions upon Defendant and may impose special conditions related to the crime Defendant committed. These conditions will be restrictions on Defendant to which Defendant will be required to adhere. Violation of the conditions of supervised release resulting in revocation may require Defendant to serve a term of imprisonment equal to the length of the term

of supervised release, but not greater than the term set forth in 18 U.S.C. § 3583(e)(3), without credit for the time served after release. Defendant understands that parole has been abolished.

**D.** **Mandatory Special Assessment:** This offense is subject to the provisions of the Criminal Fines Improvement Act of 1987 and the Court is required to impose a mandatory special assessment of $100 per count for a total of $100, which Defendant agrees to pay at the time of sentencing. Money paid by Defendant toward any restitution or fine imposed by the Court shall be first used to pay any unpaid mandatory special assessment.

**E.** **Possibility of Detention:** Defendant may be subject to immediate detention pursuant to the provisions of 18 U.S.C. § 3143.

**F.** **Fines and Costs of Incarceration and Supervision:** The Court may impose a fine, costs of incarceration, and costs of supervision. Defendant agrees that any fine imposed by the Court will be due and payable immediately.

**G.** **Forfeiture:** Defendant agrees to forfeit all of Defendant's interest in all items seized by law-enforcement officials during the course of their investigation. Defendant admits that all United States currency, weapons, property, and assets seized by law enforcement officials during their investigation constitute the proceeds of Defendant's illegal activity, were commingled with illegal proceeds, or were used to facilitate the illegal activity. Defendant agrees to execute any documents and take all steps needed to transfer title or ownership of said items to the Government and to rebut the claims of nominees and/or alleged third party owners. Defendant further agrees that said items may be disposed of by law enforcement officials in any manner.

**9.** **ACKNOWLEDGMENT AND WAIVER OF DEFENDANT'S RIGHTS**

In pleading guilty, Defendant acknowledges, fully understands and hereby waives his rights, including but not limited to: the right to plead not guilty to the charges; the right to be tried

Page **12** of **15**

by a jury in a public and speedy trial; the right to file pretrial motions, including motions to suppress or exclude evidence; the right at such trial to a presumption of innocence; the right to require the Government to prove the elements of the offenses charged against Defendant beyond a reasonable doubt; the right not to testify; the right not to present any evidence; the right to be protected from compelled self-incrimination; the right at trial to confront and cross-examine adverse witnesses; the right to testify and present evidence and the right to compel the attendance of witnesses. Defendant further understands that by this guilty plea, Defendant expressly waives all the rights set forth in this paragraph.

Defendant fully understands that Defendant has the right to be represented by counsel, and if necessary, to have the Court appoint counsel at trial and at every other stage of the proceeding. Defendant's counsel has explained these rights and the consequences of the waiver of these rights. Defendant fully understands that, as a result of the guilty plea, no trial will, in fact, occur and that the only action remaining to be taken in this case is the imposition of the sentence.

Defendant is fully satisfied with the representation received from defense counsel. Defendant has reviewed the Government's evidence and discussed the Government's case and all possible defenses and defense witnesses with defense counsel. Defense counsel has completely and satisfactorily explored all areas which Defendant has requested relative to the Government's case and any defenses.

## 10. **VOLUNTARY NATURE OF THE GUILTY PLEA AND PLEA AGREEMENT**

This document constitutes the entire agreement between Defendant and the Government, and no other promises or inducements have been made, directly or indirectly, by any agent of the United States, including any Department of Justice attorney, concerning any plea to be entered in

Page **13** of **15**

this case. In addition, Defendant states that no person has, directly or indirectly, threatened or coerced Defendant to do or refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

Defendant acknowledges having voluntarily entered into both the plea agreement and the guilty plea. Defendant further acknowledges that this guilty plea is made of Defendant's own free will and that Defendant is, in fact, guilty.

## 11. CONSEQUENCES OF POST-PLEA MISCONDUCT

After pleading guilty and before sentencing, if Defendant commits any crime, other than minor traffic offenses, violates any conditions of release that results in revocation, violates any term of this guilty-plea agreement, intentionally provides misleading, incomplete or untruthful information to the U.S. Probation Office or fails to appear for sentencing, the Government, at its option, may be released from its obligations under this agreement. The Government may also, in its discretion, proceed with this agreement and may advocate for any sentencing position supported by the facts, including but not limited to obstruction of justice and denial of acceptance of responsibility.

## 12.  **NO RIGHT TO WITHDRAW GUILTY PLEA**

Pursuant to Rule 11(c) and (d), Federal Rules of Criminal Procedure, Defendant understands that there will be no right to withdraw the plea entered under this agreement, except where the Court rejects those portions of the plea agreement that deal with charges the Government agrees to dismiss or not to bring.

01/20/2022

Date

Zachary M. Bluestone
Assistant United States Attorney

Date

Jarvis L. Fields
Defendant

Date

Nick A. Zotos
Attorney for Defendant

Page **15** of **15**